IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION

FREDDIE McRUNNELS and
THUNSHONDA D. MADISON                                    PLAINTIFFS

VS.                       CIVIL ACTION NO. 5:07-cv-113(DCB)(JMR)

CALSONIC KANSEI NORTH AMERICA, INC., and
LEROY JOHNSON, JOINTLY AND SEVERALLY                     DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on defendant Calsonic Kansei of North America ("Calsonic")'s motion for summary judgment **(docket entry 52)**, and on defendant Leroy Johnson's motion for summary judgment **(docket entry 54)**.  Having carefully considered the motions and the plaintiffs' responses, the exhibits, memoranda, and applicable law, and being otherwise fully advised in the premises, the Court finds as follows:

Calsonic, a Tennessee corporation, provides Tier One exhaust systems to Nissan North America, Inc., at Nissan's Canton, Mississippi, and Smyrna, Tennessee, manufacturing facilities. Calsonic's Vicksburg, Mississippi, facility, the situs of the actions and events alleged by the plaintiffs, closed permanently on March 31, 2007.

Plaintiff Freddie McRunnels ("McRunnels") began working at Calsonic's Vicksburg, Mississippi, manufacturing facility in approximately September of 2004, as a temporary employee placed through the StaffMark staffing agency.  McRunnels Depo., pp. 29-30.

In early February of 2005, McRunnels became a full-time employee of Calsonic as a production technician, at which time her immediate supervisor was Tim Patterson.  Id., pp. 34-36.  Under Patterson's supervision, McRunnels worked the third shift, seven days a week, from 7:00 p.m. until 7:00 a.m.  Upon becoming full-time, McRunnels attended a new-hire orientation, conducted by Leslie Murrell, Calsonic's Human Resources Manager.  Id., pp. 37-38, 70.  McRunnels was aware that Murrell worked in Human Resources and would speak with Murrell on occasion about her benefits.  Id., p. 45.  On December 19, 2005, McRunnels signed a Calsonic Team Member Acknowledgment form, stating that she received a copy of the Calsonic Team Member Handbook and acknowledging her responsibility to read and comply with the policies and procedures contained therein, including Calsonic's policy regarding sexual harassment, which specifically condemns sexual harassment as "a form of team member misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited."  Calsonic's policy further provides:

> Any team member who wants to report an incident of sexual or other unlawful harassment should promptly report the matter to his or her supervisor.  If the supervisor is unavailable or the team member believes it would be inappropriate to contact that person, the team member should immediately contact the Human Resources Department or any other member of management.  Team members can raise concerns and make reports without fear of reprisal.

McRunnels' Team Member Acknowledgment; Calsonic's Team Member Handbook; McRunnels Depo., pp. 49-51.

In March of 2006, Leroy Johnson replaced Tim Patterson as McRunnels' immediate supervisor on the third shift. McRunnels Depo., p. 63. Prior to Johnson becoming her supervisor, McRunnels knew of Johnson as the supervisor on the first shift and saw him occasionally. Any conversation between them was primarily exchanging greetings in passing. Id., pp. 171, 173-75. On May 8, 2006, Johnson conducted a "Required Communication" training session for all full-time employees and staffers, which covered, inter alia, Calsonic's policy regarding sexual and other unlawful harassment. Id., pp. 57-59; Johnson Aff., ¶ 3; Calsonic Required Communication. McRunnels confirms that both she and plaintiff Thunshonda Madison ("Madison") attended the session. McRunnels Depo., pp. 41, 58. McRunnels also acknowledges that she understood what was considered appropriate or inappropriate behavior under Calsonic's policy, that inappropriate behavior should be reported to her supervisor, and that if she was uncomfortable reporting it to her supervisor, she could report it to other management or anyone in Human Resources. Id., pp. 41-42, 53.

McRunnels' cousin, plaintiff Madison, began working at Calsonic's Vicksburg facility in January of 2006 as a temporary staffing employee employed by WillStaff Worldwide, Inc. ("WillStaff"). Madison Depo., p. 26. Like McRunnels, Madison worked initially under the supervision of Tim Patterson on the third shift, from 7:00 a.m. to 7:00 p.m., seven days a week. Id.,

pp. 37-38.  She worked at a workstation, or "cell," with four other employees, where she assembled and spot-welded parts for Calsonic muffler systems.  Id., pp. 28-29.  Madison remained an employee of WillStaff during all times relevant to this litigation.  Id., pp. 36–37.  As a term of her employment with WillStaff, Madison completed and signed both an "Interview Data Form" and a "Policies and Procedures Checklist" which collectively described sexual harassment as including, but not limited to, "vulgar language, distasteful jokes, verbal or physical conduct of a sexual nature, or creating an intimidating, hostile or offensive environment," and which directed her to promptly report "to the personnel manager or sales manager that I feel comfortable speaking with" should she be subjected to such conduct.   WillStaff Policies and Procedures Checklist; WillStaff Interview Data Form.

Johnson replaced Patterson as Madison's shift supervisor in March of 2006.  Madison Depo., pp. 38-39.  Prior to that time, Madison had not interacted with Johnson and did not know he previously managed the first shift.  Id., p. 48.  Madison was aware, however, that James Leggett was a second supervisor on duty during her shifts at the plant, although Leggett worked in another area of the facility and supervised neither Madison nor McRunnels.  Id., pp. 39-40.  Additionally, Madison knew of Leslie Murrell, "the HR person," and recognized her on the occasions she saw her around the plant.  Id., p. 41.  Madison testified that she would always

4

attend Calsonic's pre-shift meetings and confirms that she attended
the May 8, 2008 "Required Communication" session regarding sexual
harassment and signed the attendance sheet.  <u>Id</u>., pp. 57, 61.
Madison admits she was aware that she could report any concerns
about her work to her Calsonic supervisor.  <u>Id</u>., p 42.

The plaintiffs allege that, beginning "on or about April 1,
2006," they began to be subjected to unwelcome sexual advances and
inappropriate comments by Johnson, which they claim ultimately
forced them to abandon their jobs.  McRunnels' Charge of
Discrimination; Madison's Charge of Discrimination.  According to
McRunnels, Johnson engaged in a pattern of harassing conduct, which
included sneaking up behind her "numerous times" and feeling or
rubbing on her breasts and her buttocks.  McRunnels Depo., p. 79.
She alleges that he would often put his hand between her legs, and
make comments such as he would "like to have some of that," or
occasionally approach her from behind on the production line, "and
get closed up to [her], and rub his private parts up against
[her]."  <u>Id</u>., pp. 132-33.  In addition to these and similar
incidents, McRunnels alleges that Johnson frequently asked for sex
and made other sexually explicit comments.  <u>Id</u>., p. 134; McRunnels'
Charge of Discrimination.

Madison recalls similar conduct.  According to her, there were
numerous times when Johnson would "put his private part on [her]
behind" and "would grab [her] breasts, squeeze them."  Madison

Depo., p. 65.  Madison asserts that on other occasions, Johnson would follow her into the restroom where he then proceeded to either embrace her or make inappropriate comments to her.  Id., pp. 70-71, 133.  In addition to these and other incidents, Madison alleges that Johnson frequently asked for sex and made other sexually explicit comments.  Id., pp. 64-65, 132.  Madison maintains that she frequently told Johnson to stop his alleged behavior and even threatened on occasion to report him, but Johnson would just laugh it off.  Id., p. 73.

Despite Johnson's alleged conduct, neither Madison nor McRunnels ever voiced their concern to any member of Calsonic management, other than chastising Johnson himself, nor did they ever report their allegations to anyone in the Human Resources department.  McRunnels Depo., pp. 73-74; Madison Depo., pp. 74-75.  Madison also never reported Johnson's alleged conduct to anyone at WillStaff, her employer.  Madison Depo., p. 75.

The "last straw," which the plaintiffs claim forced them to abandon their jobs, took place on or around the night of May 15, 2006, while the plaintiffs and Johnson were outside the plant smoking on a routine break.  McRunnels Depo., pp. 20-25; Madison Depo., p. 79.  Even though they had never attempted to report Johnson's alleged conduct, the plaintiffs felt it necessary to purchase a recording device prior to that evening and record their encounter with Johnson, because they "felt like nobody would

believe" their story about Johnson's alleged behavior.  McRunnels

Depo., pp. 92-93.  With the recorder in her shirt pocket, McRunnels

allegedly recorded their last interaction with Johnson, which she

recounts as follows:

> A: We was outside. We was outside on break on night and
> he came out there where we was, and he said, "I know
> y'all are waiting on me."  And we said, "Waiting on you?
> Waiting on you for what?"  He said it again, "I know
> y'all are waiting on me."  We said, "We ain't waiting on
> you."  I was up, and I went down. He came down over by
> her, and he rubbed her on her behind.
> . . .
> He said, "Tell her what I told you Freddie."  I said,
> "You tell her."  And my cousin said, "What did he tell
> you, Freddie," and I never would say.  And he said, "Tell
> her what I told you, Freddie," and he said – I said, "He
> said he wanted to make my pussy wet."
> . . .
> And then he started laughing about it. So then the bell
> rung, and he kind of blocked the door so we, me and her,
> couldn't get in.  So I just went around him and opened
> the door, and then he kissed me on my lips, so I went on
> inside because I was scared, and I let her – she was
> outside trying to get back in.

Id., pp. 81-82.

As with the other alleged incidents of harassment, neither

McRunnels nor Madison reported this final incident to anyone at

Calsonic, in management or otherwise, nor did Madison report the

incident to her employer, WillStaff.  Id., p. 83; Madison Depo., p.

75.  Instead, the plaintiffs chose to leave Calsonic and not to

return to work.  McRunnels Depo., p. 83; Madison Depo., p. 79;

McRunnels' Charge of Discrimination; Madison's Charge of

Discrimination.

On May 27, 2008, both Madison and McRunnels filed formal
charges of discrimination with the Equal Employment Opportunity
Commission ("EEOC"). Calsonic first received notice of the charges
on June 5, 2006, at which time Leslie Murrell initiated an
investigation into the matter. See Position Statement of Calsonic,
signed by Leslie Murrell, Human Resources Manager, and filed in the
EEOC proceedings on June 29, 2006. Murrell began trying to contact
McRunnels and Madison beginning on June 5, 2006. On June 6, 2006,
McRunnels agreed to meet with Murrell at 10:00 a.m. on June 12,
2006. Murrell asked McRunnels to invite Madison to the meeting
because Murrell had been unable to get Madison on the phone. Id.;
McRunnels Depo., pp. 103-104. Murrell informed McRunnels that she
and Madison could have their jobs back, that she would put them on
a day shift so that they would not have to work with Johnson, and
that they could work out the details at their June 12 meeting.
Position Statement; McRunnels Depo., p. 104.

On June 12, Murrell arrived at the meeting place. Twenty
minutes later, after neither plaintiff showed up, Murrell called
McRunnels and left her a message informing her that she was waiting
for her. Position Statement. Murrell also attempted to call and
speak to Madison, unsuccessfully. Id. Murrell called McRunnels
again at 10:40, and McRunnels answered the phone. Id.; McRunnels
Depo., p. 105. McRunnels told Murrell that she was getting a tire
changed on her car, but that she would be there shortly to meet

8

her.  Position Statement; McRunnels Depo., p. 105.  That was the
last contact that Murrell had with McRunnels that day, as McRunnels
failed to show up for the meeting.  Position Statement; McRunnels
Depo., pp. 105-106.  Madison was with McRunnels at the time her
tire was being changed and knew both of the meeting and that she
could have her job back on another shift.  Madison Depo., pp. 111-
113.  However, Madison also never met with Murrell and, in fact,
when McRunnels initially informed her of the meeting, Madison
responded that "[She] wasn't going."  Madison Depo., p. 113.

The plaintiffs requested their Right to Sue notices from the
EEOC and received their respective notices of that right on
February 28, 2007.  Madison Depo., p. 115; McRunnels' Notice of
Right to Sue; Madison's Notice of Right to Sue.  On May 29, 2007,
the plaintiffs filed the instant action against Calsonic and Leroy
Johnson asserting claims of sexual harassment under 42 U.S.C.
§2000e et seq. (Title VII).[1]  Complaint, ¶¶ XI-XXI.  Their
complaint also includes claims for intentional infliction of
emotional distress.  Complaint, ¶¶ XXII-XXIII.  As a third claim,
the plaintiffs assert "willful, malicious, and reckless disregard,"
which they claim entitles them to punitive damages.  Complaint, ¶¶
XXIV-XXV.

---

[1] The plaintiffs concede that they do not have a cause of
action against defendant Johnson under Title VII.  Pl.s' Mem. in
Response to Def. Johnson's Mtn. for Summ. J'ment, p. 8.

The defendants move for summary judgment on all claims.  A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party "... the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact ...."  Fed.R.Civ.P. 56(c).  In determining whether there are any genuine issues of material fact, this Court must first turn to the applicable law to discern what factual issues are, indeed, material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Fields v. City of South Houston, Tex.</u>, 922 F.2d 1183, 1187 (5th Cir. 1991).  Then, the Court must examine the evidence of the type listed in Rule 56(c) to detect the existence or non-existence of a material issue.  <u>Id.</u>, at 1187.  Further, "... summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, at 248.  The Fifth Circuit has added:

> Both the Supreme Court and this circuit have addressed, at length, how much evidence the nonmoving party must present.  The Supreme Court explained that the standard for granting summary judgment mirrors the standard for a directed verdict.  ... "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...."  ... Nor is the "mere existence of a scintilla of evidence" sufficient ....  This circuit has described the amount of evidence the nonmoving party must bring forward as "significant probative evidence."  ... This may be equated with the "substantial evidence" standard used to determine whether a directed verdict is appropriate.

State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 118 (5th Cir. 1990)(citations omitted).

     The moving party bears the initial burden of establishing the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Lavespere v. Niagara Mach. & Tool Works, 910 F.2d 167, 178 (5th Cir. 1990).  Once the burden of the moving party is discharged, the burden shifts to the nonmoving party to go beyond the pleadings and show that summary judgment is inappropriate.  Id., at 178; Fields, at 1187.  The nonmoving party is obligated to oppose the motion either by referring to evidentiary material already in the record or by submitting additional evidentiary documents which set out specific facts indicating the existence of a genuine issue for trial.  Fed.R.Civ.P. 56(e); Fields, at 1187.  If the opponent fails in her duty, summary judgment is implicated.  Id., at 1187.  The United States Supreme Court has also stated that summary judgment is mandated where sufficient time for discovery has elapsed and a party has failed to establish an essential element of her case upon which she would have born the burden of proof at trial.  Celotex, supra, at 322; Washington v. Armstrong World Indus., 839 F.2d 1121, 1122 (5th Cir. 1988).

     Sexual harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'" violates Title VII.  Meritor Savings

11

Bank v. Vinson, 477 U.S. 57, 67 (1986)(quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).  Nevertheless, the mere existence of severe and pervasive sexual harassment directed at an employee, standing on its own, is not enough to automatically impose liability on an employer for injuries sustained by the employee.  Harper v. City of Jackson Municipal Sch. Dist., 149 Fed. Appx. 295, 298 (5th Cir. 2005).  In particular, when the alleged harasser is a supervisor, an employer will be vicariously liable per se only for "quid pro quo" harassment, or in other words, "where a tangible employment action is taken against the victim-employee by the harassing supervisor."  Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).  However, where the alleged harasser is a supervisor and where no tangible employment action is taken, the employer may assert an affirmative "Ellerth/Faragher" defense if it can show, by a preponderance of the evidence: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise."  Id. at 765.

    "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524

U.S. at 761-62.  "A tangible employment action in most cases inflicts direct economic harm."  Id.  Stated differently, a tangible employment action is the type of action a supervisor normally is empowered to take and its effect on the victim must be tangible.

In this case, the plaintiffs assert that they suffered tangible employment actions because their jobs with Calsonic "were dependent on their submissions to Defendant's, Leroy Johnson['s], sexual advances" and that Calsonic "made acquiescence to Defendant Johnson's sexual harassment a necessary prerequisite to Plaintiffs' continued employment."  Complaint, ¶¶ XIV, XVI.  However, the plaintiffs' claims are undercut by their own testimony.  McRunnels testified on the issue as follows:

> Q: Did Mr. Johnson ever tell you that your job was dependent upon submitting to sexual advances from him?
>
> A: No.

McRunnels Depo., p. 114.

> Q: Did Mr. Johnson ever threaten to terminate your employment?
>
> A: No.

Id., p. 99.  She also testified that Johnson stated to both Madison and McRunnels, during their final May 15, 2006, exchange, that "I ain't going to fire you all.  I like you too much to fire you."  Id., pp. 13-14.

McRunnels fails to establish that she ever had a reason to suspect that her job was dependent upon her submission to sexual advances.   Nor has she shown any actual change in her employment status or direct economic harm at the hands of Johnson that could arguably be due to her rejection of his alleged harassment. McRunnels testified that throughout her tenure with Calsonic, she received only one written Notice of Disciplinary Action, which was signed by Johnson in August of 2005.   It is undisputed that the written warning was issued because she left her job early one afternoon without the approval of a supervisor.   Id., p. 110. McRunnels suffered no reduction in pay, demotion, transfer or any other change in status.   Nor were her job duties changed as a result of the written warning.   Id., pp. 112, 166; Notice of Disciplinary Action.  Moreover, the notice was issued approximately eight months before the time McRunnels claims her alleged harassment began, and McRunnels admits that although it was signed by Johnson, it was actually issued by Tim Patterson, her supervisor at the time.  McRunnels Depo., pp. 112, 166, 196.

Madison testified that she "felt like" if she didn't give in to Johnson's alleged harassment, "he would make us suffer over there.  He would raise the number on production" from 360 units per shift to 1,000 units.  Madison Depo., p. 128.  However, Madison went on to state that these temporary raises in production were not directed specifically at her, but impacted everyone in her station,

and that a failure to meet the number caused no economic harm to
her specifically because such failure had absolutely no effect on
her compensation.  Id., p. 157.  Madison also admitted that
producing 1,000 units on a certain muffler product was possible.
Id., p. 130.  Madison admitted that she never had a conversation
with Johnson about why production numbers were raised, but only
assumes that he did it "because [she] wouldn't sleep with him."
Id., pp. 128, 167.

Madison also asserts that her rejection of Johnson's
harassment resulted in Johnson's refusal to grant her request for
a night off on one occasion.  Id., pp. 128-129.  However, she
admits that she never personally asked Johnson for the night off,
but instead sent a co-employee to ask on her behalf, who then
informed her that Johnson had refused the request.  Id., pp. 164-
165.  Assuming that Johnson denied the request, such denial cannot
be considered a tangible employment action where there is no
evidence to show that it was the result of Madison's rejection of
alleged harassment and where Madison does not allege that she
suffered a change in employment status or direct economic harm.

Neither plaintiff has produced any evidence that she had a
reason to believe her job was conditioned on submission to
harassment.  Nor have the plaintiffs shown that they suffered any
significant change in their employment status or direct economic
harm at the hands of Johnson as a result of any failure to

acquiesce to the alleged conduct.  Up to and through the time they voluntarily abandoned their jobs, the plaintiffs had no reason to believe that their failure to acquiesce to any alleged sexual advances would cost them their jobs.  The plaintiffs have suffered no tangible employment action at the hand of Johnson; therefore, Calsonic is not per se liable for Johnson's alleged conduct and may assert the Ellerth/Faragher defense to liability.

Calsonic asserts that it acted reasonably to prevent and correct promptly any sexual harassment because it had a policy specifically addressing sexual harassment, which contained reasonable complaint procedures and was communicated to the plaintiffs.  Proof that an employer has promulgated an anti-harassment policy is not necessary to prove reasonableness in every instance, but at the same time, neither does the existence of a grievance procedure, standing alone, automatically satisfy the employer's burden.  Ellerth, 524 U.S. at 765.  However, where an employer establishes that it "(1) has an anti-harassment policy specifically addressing the particular harassment, (2) the policy provides for alternative means of reporting harassment, and (3) the policy has been communicated to the employees," its burden may be satisfied.  Burrell v. Crown Central Petroleum, Inc., 121 F. Supp. 2d 1076, 1082 (E.D. Tex. 2000)(citing Meritor Sav. Bank, 477 U.S. at 72-73; see also Lauderdale v. Tex. Dept. of Criminal Justice, 512 F.3d 157, 164 (5th Cir. 2007) (finding that employer established

16

reasonable care "by virtue of its institutional policies and educational programs regarding sexual harassment").

Calsonic's policy meets this standard.  First, Calsonic's policy specifically addresses sexual harassment, provides employees with a definition of the type of conduct considered harassment, and specifically states that it is prohibited.  <u>See</u> Calsonic's Team Member Handbook ("As an example, sexual harassment (both overt and subtle) is a form of team member misconduct that is demeaning to another person, undermines the integrity of the employment relationship, and is strictly prohibited.").

Second, Calsonic's policy provides employees with three reasonable alternatives when reporting sexual harassment: report such behavior to their immediate supervisor, or if they feel that would be inappropriate, report it to the human resources department, or report it to any other member of management.  <u>Id</u>. <u>See</u> <u>Madray v. Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1299 (11th Cir. 2000)(holding sexual harassment policy sufficient "because the procedures did not require that the employee complain to the offending supervisor or through the supervisor's chain of command and the procedures provided multiple avenues of lodging a complaint to [accessible], designated representatives"); <u>Montero v. Agco Corp.</u>, 192 F.3d 856, 862 (9th Cir. 1999)(holding that a policy that identified only an employee's supervisors and the human resources

17

department as the appropriate vehicles to lodge a harassment complaint satisfied the requirement that an employer exercise reasonable care to prevent harassment).

Third, Calsonic effectively communicated its policy to the plaintiffs.  Calsonic posted its policies and procedures regarding sexual harassment on the bulletin board within the Vicksburg plant, including a "5-in-1" discrimination poster.  Murell Depo., p. 78. According to Murrell, this "very large" poster included applicable federal government laws and regulations regarding Title VII and nondiscrimination, and provided workers with contact information to address complaints of harassment.  Id., pp. 120-121.  McRunnels acknowledged receipt of the policy in the Calsonic Team Member Handbook upon her hire.  Although she claims that she does not specifically remember receiving the handbook, she admits having signed the form acknowledging her receipt of the manual, and verifies that the signature on the form is indeed hers.  McRunnels Depo., p. 39; McRunnels' Team Member Acknowledgment.  At a minimum, McRunnels is deemed to have constructive knowledge of the policy. See Shaw v. AutoZone, Inc., 180 F.3d 806, 811 (7th Cir. 1999)(holding that, for purposes of Faragher/Ellerth defense, plaintiff had constructive knowledge of employer's anti-harassment policy where employee received a copy of the policy, was required as a condition of employment to comply with the policy, and signed an acknowledgment form stating that she would adhere to the

policies).  Additionally, both McRunnels and Madison were informed of the policy and trained on reporting procedures at the May 8, 2006 "Required Communications" meeting, which they both admit attending.  Although the plaintiffs claim they do not recall the topics discussed at the meeting, Johnson recalls discussing reporting procedures, the sign-in sheet indicates sexual harassment as a topic to be discussed, and both plaintiffs signed the attendance sheet indicating their presence at the meeting.  Johnson Aff., ¶ 3; Johnson Depo., p. 114.  Neither plaintiff affirmatively denies that sexual harassment training took place.  McRunnels Depo., pp. 41, 58; Madison Depo., pp. 61-62.  Moreover, both plaintiffs testified that they knew and understood the proper procedure.  McRunnels understood that Calsonic had a policy prohibiting sexual harassment in place, she understood that there was a procedure available to her to have any concerns reviewed and addressed, and she understood that she could bypass Johnson and report to Human Resources or other management.  McRunnels Depo., p. 53.  Madison was aware that she could report any questions or concerns about her work to her supervisor.  Madison Depo., p. 42. She was also aware that she could report Johnson's behavior to someone else at Calsonic if she so chose:

> Q: Okay. What did you say to Mr. Johnson when he did these things that you claim he did?
>
> A: I told him to stop. I also told him that I would report him, and he told me he didn't care because he was the plant manager.

Id., p. 72.  Moreover, Madison's prior receipt and acknowledgment of WillStaff's policies and procedures regarding sexual harassment upon her hire as a placement candidate shows that she was aware of reporting and grievance procedures similar in all material respects to Calsonic's policies and procedures.  Based on the foregoing, the Court finds that Calsonic took reasonable care to prevent and, if afforded the opportunity, promptly correct any alleged sexual harassment.

The Court also finds that the plaintiffs failed to take advantage of Calsonic's preventive and corrective opportunities because they never reported the alleged conduct of Johnson, or otherwise complained to anyone in management or human resources at Calsonic, other than to Johnson himself.  The plaintiffs' failure continued even after they attended the May 8, 2006, training session on sexual harassment and later when they refused to cooperate with the investigation initiated by Calsonic after they voluntarily abandoned their jobs.  "[P]roof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer."  Ellerth, 524 U.S. at 765.  However, "a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the [Ellerth/Faragher] defense."  Id.; see also Harper, 149 Fed. Appx. at 301.  The second element of the defense "effectuates a

20

policy imported from the general theory of damages that a victim
has a duty to use such means as are reasonable under the
circumstances to avoid or minimize the damages that result from
violations of [Title VII]." Harper, 149 Fed. Appx. at 301
(internal quotations and citations omitted). Accordingly, Calsonic
cannot be held liable for conduct of which it had no knowledge, and
the plaintiffs had an obligation to report the alleged harassment
to the appropriate parties. The failure to do so is fatal to their
claim of vicarious liability against Calsonic. See Woods v. Delta
Beverage Group, Inc., 274 F.3d 295, 300 (5th Cir. 2001)(finding
employer had no knowledge of, and thus no liability for, actions of
another employee where victim failed to report alleged harassment
for a second time after initial corrective action had been taken).

Despite their knowledge of the Calsonic sexual harassment
policy, the plaintiffs chose not to report the alleged actions of
Johnson to any member of Calsonic's management team or human
resources department before abandoning their jobs. McRunnels
testified that she understood that the Calsonic policy gave her the
right to report to her supervisor, and to any other member of
management or human resources if she felt it inappropriate to go to
the supervisor. McRunnels Depo., pp. 45-46, 50. She also stated
that at the time of the alleged harassment, she knew who Leslie
Murrell was, she was aware that Murrell was a member of the human
resources department, and she knew other members of management

through her employment at the plant, including the other third
shift supervisor, James Leggett.  Id., p. 47.  McRunnels was
apparently comfortable speaking to Murrell because she had done so
in the past regarding other employment-related issues.  Id., pp.
48-49.  Despite these facts, McRunnels chose not to report
Johnson's alleged conduct; instead, she chose to quit without
notice, even though she and Madison had received training on the
proper complaint procedure as recently as 7 days before.  Id., p.
51.

     Madison followed the same course.  She knew that Leslie
Murrell "was just basically the HR person, and I would see her
sometimes whenever she would probably walk around the plant."
Madison Depo., pp. 40-41.  Like McRunnels, Madison knew other
members of Calsonic management through her employment, specifically
James Leggett on the third shift.  Id., p. 30.  Madison also chose
not to report the alleged behavior of Johnson to any of these
individuals.  Instead, she quit her employment without notice, like
McRunnels, and pursued administrative remedies as her first course
of action.

     The Court finds that the failure of the plaintiffs to utilize
Calsonic's reporting procedures is unreasonable as a matter of law,
especially in light of the plaintiffs' training on sexual
harassment procedures.  Even after allegedly taking steps to record
Johnson's objectionable behavior so that they would have "proof,"

22

the plaintiffs still failed to report his behavior to anyone at Calsonic.  Moreover, within one week of learning of the Plaintiffs' complaint through the EEOC, Calsonic began efforts to correct any alleged harassment by initiating an investigation into the matter. The plaintiffs, however, refused to cooperate with Calsonic's investigation.  As previously discussed, once notified, Leslie Murrell immediately contacted the plaintiffs and offered them their jobs back on the first shift, away from Johnson, while Calsonic undertook further investigation into their allegations of harassment.  McRunnels Depo., p. 101; Madison Depo., pp. 111-112. Without proper notice of the plaintiffs' claims through reporting, Calsonic cannot be held vicariously liable for any of the alleged actions of Johnson.

The plaintiffs also cannot show that they were constructively discharged, because they quit their employment without allowing Calsonic any reasonable opportunity to remedy the situation.  A constructive discharge occurs when a reasonable person in the employee's position would view his or her working conditions as intolerable and would feel that he or she had no other choice but to quit.  Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004); Brown v. Bunge Corp., 207 F.3d 776, 782 (5th Cir. 2000). Under the constructive discharge doctrine, an employee's reasonable decision to resign is assimilated to a formal discharge for remedial purposes.  Id.  Therefore, a constructive discharge will

23

suffice as a "tangible employment action" subjecting an employer to vicarious liability, without recourse to an affirmative defense, where the employee resigns because of official acts of a supervisor.  Id.; Jackson v. Arkansas Dept. of Educ., 272 F.3d 1020, 1026 (8th Cir. 2001).  To succeed on a claim of constructive discharge, the victim's decision to resign "must have been reasonable under all the circumstances." Barrow v. New Orleans Steamship Ass'n, 10 F.3d 292, 297 (5th Cir. 1994).  "The reasonableness of a plaintiff's decision is measured by an objective test." Hunt v. Rapides Healthcare Sys., LLC, 277 F.3d 757, 772 (5th Cir. 2002).  To prove constructive discharge, a plaintiff "must demonstrate a 'greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment claim.'" Woods, 274 F.3d at 301 (quoting Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998)).

The plaintiffs contend that they were constructively discharged when they "were forced to resign from their position[s]" at the Calsonic plant because "they refused to participate in the sexual activity demanded by Defendant Leroy Johnson, or submit to a continuation of the activities, actions, attitudes and conduct" of Johnson.  Complaint, ¶ XX.  However, because Title VII contemplates the parties' efforts at conciliation as an alternative to litigation, the plaintiffs' failure to allow Calsonic an opportunity to remedy the situation before they abandoned their

24

jobs was unreasonable as a matter of law and is fatal to their
claim of constructive discharge.  See Ellerth, 524 U.S. at 764;
Hockman v. Westward Communications, LLC, 407 F.3d 317, 332 (5th Cir.
2004).  As discussed above, the plaintiffs admit that they were
aware of and failed to follow Calsonic's reporting procedures
regarding sexual harassment, but chose instead to quit their jobs
without notice and file charges of discrimination with the EEOC.
McRunnels Depo., pp. 50-51; Madison Depo., pp. 42, 57; McRunnels'
Charge of Discrimination; Madison's Charge of Discrimination.

> The reasonableness of a plaintiff's decision to resign is
> examined in light of the actions of their employer after
> the abuse is disclosed.  As the Fifth Circuit has noted,
> once an employer takes reasonable steps to correct sexual
> harassment after being notified of the problem, the
> employee has "an obligation to give the company another
> opportunity to remedy the problem before deciding that
> she could not work there anymore."  Woods v. Delta
> Beverage Group, Inc., 274 F.3d 295, 301 (5th Cir. 2001).
> If the employer takes quick remedial action to end the
> harassment, "[t]his factor alone is fatal" to a
> plaintiff's claim of constructive discharge.  Webb v.
> Cardiothoracic Surgery Associates of North Texas, P.A.,
> 139 F.3d 532, 539-40 (5th Cir. 1998).

Williams v. Barnhill's Buffet, Inc., 2008 WL 111292 *5 (S.D. Miss.
Jan. 8, 2008).  The court in Williams granted summary judgment in
favor of the employer on the plaintiff's constructive discharge
claim because the fact that the plaintiff "had chosen to leave [her
job] before she even reported the actions of [her supervisor] to
store management" failed the test of objective reasonableness.  Id.
The same is true in the case sub judice.  The plaintiffs' decisions
to abandon their jobs without following Calsonic's proscribed

25

complaint procedures deprived Calsonic of its chance to take remedial action. Once Calsonic found out about Johnson's alleged conduct, it initiated an investigation into the matter in addition to offering the plaintiffs their jobs back on a different shift schedule. The plaintiffs' resignations cannot be deemed reasonable and cannot form the basis for a constructive discharge claim. <u>See Boze v. Branstetter</u>, 912 F.2d 801, 805 (5th Cir. 1990)(affirming summary judgment on constructive discharge claim where employee waited until he resigned to complain of intolerable work conditions, because the policies underlying Title VII are best served by attacking discrimination within the context of the existing employment relationship).

Because the plaintiffs have suffered no tangible employment action, in the form of constructive discharge or otherwise, Calsonic may properly assert the <u>Ellerth/Faragher</u> affirmative defense to vicarious liability for the alleged actions of Johnson. Furthermore, because Calsonic had in place a sexual harassment policy with clear-cut avenues for reporting such conduct, because the plaintiffs unreasonably failed to take advantage of the preventative and corrective opportunities, and because Calsonic took reasonable efforts to prevent and correct promptly the alleged harassment once it learned of the allegations, Calsonic is entitled to summary judgment that it is not vicariously liable for the alleged acts of harassment by its supervisor Johnson.

26

As for the plaintiffs' claim for intentional infliction of emotional distress ("IIED") against Calsonic, they must show, under Mississippi law, that "there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally ... the result being reasonably foreseeable ... even though there has been no physical injury." Sears, Roebuck & Co. v. Devers, 405 So.2d 898, 902 (Miss. 1981). The plaintiffs claim that the conduct of the defendants included "participating in pervasive wrongful sexual harassment, and if not directly participating in said conduct, ignoring it when brought to their attention, and giving it tacit approval ...." Complaint, ¶ XXIII. The facts in this case clearly indicate that Calsonic did not "participate" in the alleged wrongful sexual harassment, and that it was not brought to Calsonic's attention until after the plaintiffs had left their jobs, at which time Calsonic began investigating the allegations. Therefore, there is nothing about Calsonic's conduct which could evoke outrage or revulsion, and the IIED claim against Calsonic shall be dismissed.

Defendant Johnson also moves for summary judgment on the IIED claim on grounds, inter alia, that this claim is barred by the one-year statute of limitations set forth in Miss. Code Ann. § 15-1-35. The alleged wrongful conduct began "on or about April 1, 2006," and culminated with the plaintiffs abandoning their jobs on May 15, 2006, without notice. Complaint, ¶ VIII; McRunnels' Charge of

Discrimination; Madison's Charge of Discrimination.  However, the plaintiffs did not file their complaint until May 29, 2007, more than one year after they abandoned their jobs.  Their IIED claim is therefore untimely.

The plaintiffs initially claim that Johnson's statute of limitations argument is contained in a supplement to his memorandum brief that was filed after the motions deadline, and is therefore untimely.  At the time Johnson filed his supplemental brief, the plaintiffs had not responded to his motion for summary judgment.  Moreover, Johnson had raised the statute of limitations in his answer to the plaintiffs' complaint.  The Court finds that the plaintiffs were not prejudiced by the delay because they had timely notice of the statute of limitations defense from Johnson's answer, and the delay was not unreasonable.

The plaintiffs also contend that their IIED claim is not barred by the limitations period because "IIED is a derivative claim of ... Title VII sexual harassment not subject to the one-year period of limitations."  Pl.s' Response to Johnson's Suppl. Mem. in Support of Mtn. for Summ. J'ment, p. 4.  In Crittendon v. American Nat'l Ins. Co., 967 F. Supp. 933 (S.D. Tex. 1997), the district court for the Southern District of Texas considered a similar argument.  The defendant sought summary judgment on the plaintiff's state law claims including a claim for intentional infliction of emotional distress.  The plaintiff had filed her

claims five months after she received her notice of right to sue
from the EEOC, but well after the applicable two-year statute of
limitations on her state law IIED claim had expired.  <u>Id</u>. at 937.
She argued that tolling the statute would prevent duplicative
proceedings between the courts and the EEOC.  <u>Id</u>. at 939.  The
district court noted that "the filing of a Title VII charge is not
a prerequisite for the institution of a state law personal injury
action alleging claims of intentional infliction of emotional
distress ...."  <u>Id</u>.  The plaintiff could have filed her state law
claims at any time after her cause of action accrued, and could
have simply asked the court to stay the proceedings until
administrative efforts were completed.  <u>Id</u>.

     The court's reasoning in <u>Crittendon</u> applies in this case as
well.  The plaintiffs' state law claims could have been filed at
any time after their cause of action accrued, and stayed during the
pendency of the EEOC proceedings.  Nothing required the plaintiffs
to await their notice of right to sue on their Title VII claims
before filing their state law claims.  The plaintiffs shall not be
allowed to circumvent the statute of limitations simply because of
their own lack of diligence in pursuing their claims.  Accordingly,
Johnson is entitled to summary judgment on the IIED claims due to
the plaintiffs' failure to timely file.

     Since the plaintiffs cannot pursue their state law tort
claims, they are prevented from seeking punitive damages as well.

The defendants are therefore entitled to summary judgment on all claims.  Accordingly,

IT IS HEREBY ORDERED that defendant Calsonic Kansei of North America's motion for summary judgment **(docket entry 52)**, and defendant Leroy Johnson's motion for summary judgment **(docket entry 54)** are GRANTED as to all claims.

A final judgment dismissing this action with prejudice shall follow.

SO ORDERED, this the 18th day of November, 2008.

/s/ David Bramlette
UNITED STATES DISTRICT JUDGE